IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| PATRICE L. TAVERNIER, | ) Civil Action No. 0:10-1753-MBS-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| HEALTH MANAGEMENT ASSOCIATES, | ) |
| INC. and | ) |
| CHESTER HMA, LLC, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

    Plaintiff, Patrice L. Tavernier, filed this action on July 6, 2010. She alleges claims of age

discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.

("ADEA"), sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e et seq. ("Title VII"), and pay discrimination in violation of the Equal Pay Act of 1963, 29

U.S.C. § 206(d)(1) ("EPA"). Defendants are Health Management Associates, Inc., and Chester

HMA, LLC (hereinafter collectively referred to as "HMA").[1] Defendants filed counterclaims for

breach of contract and unjust enrichment against the Plaintiff on September 3, 2010.

    Plaintiff filed a motion for summary judgment as to Defendants' counterclaims on May 25,

2011. Defendants filed a response on June 13 and Plaintiff filed a reply on June 20, 2011. On May

31, 2011, Defendants filed a motion for summary judgment as to Plaintiff's claims. Plaintiff filed

a response on June 17, and Defendants filed a reply on June 27, 2011.

---

    [1]Defendants contend they are not correctly identified and that Plaintiff has not been employed
by Health Management Associates, Inc. or Chester HMA, LLC . They provide that at all relevant
times, Plaintiff was employed by Hospital Management Services of Florida, Inc., a wholly-owned
subsidiary of Health Management Associates, Inc. See Linda Herriage Decl.

# FACTS

1.     HMA owns and operates general acute care, non-urban hospitals. Fred Drow ("Drow") Dep. 11.[2]

2.     Plaintiff began working for HMA in May 1992 as Chief Nursing Officer at Fisherman's Hospital in Marathon, Florida. She became that hospital's interim administrator in 1995 and administrator in 1996. In January 2000, Plaintiff became Associate Administrator at HMA's Northwest Mississippi Regional Medical Center in Clarksdale, Mississippi. From there, she moved to Hartsville, South Carolina in January 2001 as Associate Administrator of HMA's Carolina Pines Medical Regional Center. She became that hospital's Chief Operating Officer ("COO") in January 2002. Plaintiff's Dep. 22, Ex. 5.

3.     In September 2004, Plaintiff applied for and was promoted to CEO of Chester Regional. Here salary increased from $105,000 (as COO of Carolina Pines) to $130,000. She also received other financial payments and benefits. P. Dep. 30, 33-34; Ex. 9, 10.

4.     Plaintiff was satisfied with the terms of this compensation and considered it fair given her experience. P. Dep. 34. She subsequently received increases in salary to $137,000 in 2005, $150,000 in 2006, and $157,000 in 2007. P. Dep., Ex. 5.

5.     When Plaintiff first started working at Chester Regional, she informed Debbie Brantley ("Brantley"), her Administrative Assistant, that she planned to retire in four to five years. Brantley Decl. Plaintiff does not recall making this comment. P. Dep. 109.

---

[2]Drow was the Vice President of Human Resources at all relevant times to the alleged incidents.

6.   At the time Plaintiff began as CEO at Chester Regional, Page Vaughan ("Vaughan) was the Regional Vice President and her supervisor. Vaughan directly supervised Plaintiff from 2004 through August of 2008. Vaughan Decl.; P. Dep. 83-84, Ex. 9.

7.   Vaughan was generally satisfied with Plaintiff's performance in 2005 and 2006, but not in 2007. He thought that her level of engagement, drive and dedication deteriorated significantly beginning in 2007. In December 2007, Vaughan informed HMA's COO about Plaintiff's performance deficiencies and lack of engagement. He recommended moving Plaintiff out of the CEO position at that time. HMA's COO decided to issue Plaintiff a performance plan instead. Vaughan Decl.

8.   In January of 2008, Vaughan conducted Plaintiff's 2007 performance evaluation. Vaughan Decl; P. Dep., Ex. 17. Plaintiff received the lowest possible score for the financial performance of the hospital. P. Dep. 58, Ex. 17. She was placed on a ninety-day probation and performance action plan. Vaughan Decl; P. Dep. 68, Ex. 17 (Bates # 501).

9.   Chester Regional was not meeting HMA's performance expectations in 2007. P. Dep. 58. Although Plaintiff was not satisfied with the financial performance of the hospital, she was satisfied with her own performance and did not think she could have done more to affect the financial status of the hospital. P. Dep. 62-63. She admits the CEO is ultimately responsible for the hospital's performance and correcting its performance, and that part of the evaluation was factually based. P. Dep. 59-60, 65-66.

10.  At the end of 2007, Chester's Regional financial performance ranked 29 out of 58 among HMA hospitals. The other hospitals in the same region as Chester ranged 19, 23, 35, 40, 41,

and 43.  Chester Regional was approximately $1.5 below the Chairman's Challenge "for-profit" goals.  P. Dep. 48-50; P. Opp. Mem. Ex. E.

11.    In drafting the action plan, Plaintiff included things she was already doing just to satisfy Vaughan.  P. Dep. 75-80.

12.    Plaintiff contacted the President of HMA and complained about Vaughan's supervision and her evaluation.  Vaughan had been absent for the second half of 2007 due to a serious injury in an automobile accident and then being sent by HMA to Oklahoma on a special assignment.  P. Dep. 59, 65, 68-72.

13.    Plaintiff called Vaughan at the end of the 90 days and asked about her status.  She says he told her that he thought it was fine, but answered "we'll see" when she asked if she was off probation.  She asked him in September or October if she was off probation and he said that because she had gotten another raise she was "obviously off" probation.  P. Dep. 82.  Vaughan states that he was reassigned by HMA to a hospital in Oklahoma in July of 2008, and thus never completed or finalized the results of Plaintiff's performance improvement plan.  He states that while he did notice some improvement initially, he did not believe Plaintiff was meeting HMA's expectations.  He also states that in 2007 the financial performance of Chester Regional was not meeting HMA's expectations.  Vaughan Decl.

14.    HMA hired Vicki Briggs ("Briggs") in August of 2008 to replace Vaughan.  See P. Dep. 84.

15.    On August 28 and 29, 2008, Briggs conducted her first site visit to Chester Regional.  P. Dep. 101.  During a meeting with Plaintiff to discuss the status of and future plans for the hospital, Briggs claims that Plaintiff said she planned to retire in one or two years.  Briggs Dep. 26-28.  In her notes from the meeting, Briggs wrote:

4

> Developing succession plan for CEO-plans to retire in 1 to 2 years - Patrice Tavernier has been with HMA since 1992; at Chester since 2004.

Briggs Dep., Ex. 1. Plaintiff denies discussing plans to retire with Briggs. P. Dep. 107, 114-115.

16. Also during August 2008, Chester Regional was attempting to fill a vacant COO position. One of the candidates was Craig Walker ("Walker"). Walker has a Masters Degree in Health Administration and considerable hospital administration experience. Walker Decl. In an initial telephone conversation between Walker and Plaintiff, Plaintiff told Walker that she believed he was overqualified for the COO position. Walker claims that during an interview at Chester Regional, Plaintiff "sold" the COO position by stating she planned to retire from the CEO position and was looking to hire a successor. Walker Decl.

17. Plaintiff does not recall the conversation the same way as Walker, but she recalls telling him he had the potential to become CEO when she retired. She was aware that Walker accepted the COO position with the expectation of becoming a CEO. She admits that Walker was overqualified for the COO position and qualified for the CEO position. Plaintiff asserts that she recommended another candidate as she had no plans to retire, but Briggs hired Walker over her objections. P. Dep. 110-112, 114.

18. In June of 2007, Plaintiff and her husband decided to try to sell their home in Chester. David Tavernier Dep. 9-10. They subsequently began building a new home in Aiken, South Carolina (they had a second home in Aiken since 1987), which was completed in July of 2008, at which time Plaintiff's husband immediately moved into the home. P. Dep. 230-233. Plaintiff and her husband leased their home in Chester. Plaintiff moved into an apartment in

Chester and generally lived there during the week and with her husband in Aiken on the weekends. David Tavernier Dep. 9-12.

19. Briggs determined that the overall performance of Chester Regional was well below expectations. Based on the performance of Chester Regional and with the understanding that Plaintiff indicated some interest in retirement, Briggs determined that a retirement package could be a "win/win" situation for both Plaintiff and HMA. Briggs Dep. 34-35. Briggs received approval to offer Plaintiff a retirement package that included paying her six months of salary (a total of $78,500) spread over a twelve-month period, health insurance for twelve months, and other continued vesting benefits. Briggs Dep. 36; See P. Dep. 128, Ex. 23.

20. Briggs met with Plaintiff on December 4, 2008. At the meeting, Briggs made the above retirement offer. Briggs Dep. 36; P. Dep. 118. Plaintiff was shocked and speechless by the offer, and was not prepared for it. She asked Briggs if she had any options other than retirement. Briggs responded that "there were no options." P. Dep. 120. Briggs does not recall making this statement about options. Briggs Dep. 39. Briggs contends that she never told Plaintiff that her employment was going to be terminated if she did not retire and states she was not prepared to terminate Plaintiff's employment at the time. Briggs Dep. 39.

21. During the meeting, Plaintiff asked if the payment could be increased to nine months of pay spread over a fifteen-month period with paid benefits for fifteen months. This extension would provide Plaintiff insurance until she was eligible for social security and medicare benefits. Plaintiff states that because she had no options other than to retire, she negotiated the best retirement package she could under the circumstances. P. Dep. 122, 128-131, 134, 138-139, 238-239; Ex. 24.

6

22. Briggs sought and received approval to accept Plaintiff's counterproposal. See P. Dep. 131-134; Ex. 23-24.

23. Plaintiff responded to Briggs in an email:

> Sounds better now but I need to see everything in writing from Fred [Drow] so Dave [Plaintiff's husband] and [I] can take this weekend and calculate accordingly how this covers us-I will tell you on Monday but feel this will be fine - like I said, I need to see the whole package in writing as you have stated it but from HR.
> Thanks plt

P. Dep. 133-134, Ex. 25.

24. Plaintiff did not seek an explanation from HMA about the reason for the retirement offer. She did not complain to any of Briggs' supervisors about the offer or tell them that she felt she was being forced to retire. Plaintiff did not ask Briggs or anyone else within HMA whether it was possible to move to another position within the company.[3] P. Dep. 122, 125-126, 149-150.

25. After discussing the retirement offer with her husband, Plaintiff accepted the negotiated retirement offer. She was 64 at the time. See P. Dep. 134-149; Complaint, ¶ 16.

26. HMA did not require Plaintiff to sign any type of agreement or release.

27. Drow states that the retirement package was presented to him as a "positive type thing and that we were going out of our way to do a little bit more for her than we usually do for people. In fact, if it would have been an involuntary situation, I'm sure I would have handled it quite differently. We have a policy where we would never give that much severance to a person without them signing a general release in anything that's at all contentious." Drow.

---

[3]She did ask Drow about coming back to HMA, but not until several months after her separation from HMA. P. Dep. 126.

Dep. 44. Drow confirmed the terms of the retirement in an e-mail on December 8, 2008. Drow Dep. 39-40, Ex. 5.

28. HMA fully paid Plaintiff in accordance with the terms of the negotiated retirement. It also paid her a car allowance and her country club dues for fifteen months. It also paid her an additional $3,834.77. The amount paid totaled $133,563.78. P. Dep. 142-143, 160, Ex. 27; Linda Herriage ("Herriage") Decl.[4]

29. Walker, who was 41 (see P. Opp. Mem., Ex. B), replaced Plaintiff as the CEO at Chester Regional. His compensation was set at $150,000, $7,000 lower than Plaintiff's salary. Walker Decl.

30. The local newspaper published an article on Plaintiff's retirement and Walker's promotion. Plaintiff stated she would be moving back to Aiken and spending more time with her 91-year-old mother, and discussed her plans to travel. Brantley Decl., Att. Immediately after her retirement, Plaintiff moved back to Aiken to live with her husband. Plaintiff Dep. 230-233.

31. Plaintiff started working on a new business opportunity for physician recruiting with her husband. Plaintiff requested and HMA approved a contract between HMA and Plaintiff's new business to pay her a commission for physician recruiting at HMA's hospitals. She never recruited a physician under the contract and was therefore never paid the contract. P. Dep. 195-198, 200, Ex. 40.

---

[4]Herriage is the Director of Human Resources for Health Management Associates, Inc. See Herriage Decl.

8

32. After Plaintiff's attempts to start the new business venture failed, Plaintiff contacted Drow to inquire whether there were any opportunities to return to work for HMA. P. Dep. 125-126, 211; Drow Dep. 38, 45.

33. Following Plaintiff's retirement, Plaintiff only submitted three applications for employment. One of the applications was to Aiken Regional Medical Center in March 2010. She was offered the position at that time and began her new position in May 2010. P. Dep. 206-208.

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. Anderson, 477 U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987); Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e)(1-4).

## DISCUSSION

Plaintiff alleges that Defendants discriminated against her based on her age in violation of the ADEA, and paid her less than comparable CEOs in violation of Title VII and the EPA. Defendants contend that Plaintiff fails to establish her claims under the ADEA, Title VII, or the EPA. They also argue that Plaintiff waived her rights to pursue any claim under the ADEA by negotiating

and continuing to accept retirement payments while at the same time pursuing these claims. In its counterclaims, Defendants allege that Plaintiff breached a binding retirement contract by contesting that she voluntarily resigned from HMA or a subsidiary while continuing to accept the value of the retirement contract, and that she was unjustly enriched by accepting the benefits of her voluntary retirement contract and failing to satisfy the terms of such. Plaintiff contends that she is entitled to summary judgment as to Defendants' counterclaims because these counterclaims are barred by the Older Workers Benefit Protection Act amendment to the ADEA.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    ADEA

Plaintiff alleges that she was terminated by HMA, she was meeting or exceeding HMA's performance expectations at the time of her termination, and she was replaced by a significantly younger employee. She claims that her involuntary termination and forced retirement constitute an adverse employment action within the meaning of the ADEA. HMA argues that it is entitled to summary judgment because Plaintiff fails to establish a prima facie case of age discrimination; it has offered a legitimate, nondiscriminatory reason for its actions; and Plaintiff has not shown pretext and "but for" causation.

"[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, ___, 129 S.Ct. 2343, 2352 (2009). Under the alternative burden-shifting method of proof of McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973),[5] a plaintiff may establish a prima facie case of age discrimination under the ADEA by showing that: (1) she is a member of the protected class; (2) her employer took an adverse employment action against her; (3) she was performing her job to the legitimate expectations of her employer; and (4) she was either replaced by someone outside the protected class or similarly-situated employees outside of her protected class were treated more favorably. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). If the Plaintiff can establish a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the Plaintiff. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981)(this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

(1)    Direct Evidence of Discrimination

Plaintiff alleges that she has produced direct evidence of age discrimination because she was told by Briggs at the December 4, 2008 meeting that she had to retire and there were no other options than retirement. This, however, is not direct evidence of discrimination. In the employment context, direct evidence of discrimination is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir.1999)(en banc),

---

[5]The Supreme Court noted that it has not "definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Id. at __, 129 S.Ct. at 2349 n.2. In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d at 285.

abrogated on other grounds, <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003). Here, Plaintiff has not pointed to anything to show that age was a factor in the alleged adverse employment decision.

        (2)        <u>Prima Facie Case (Indirect or Circumstantial Evidence of Discrimination)</u>

HMA argues that Plaintiff cannot establish her prima facie case of age discrimination because she did not suffer an adverse employment action as she voluntarily retired and she was not performing her job duties at a level that met HMA's legitimate expectations at the time of her retirement. Plaintiff disputes this.

For purposes of summary judgment, the undersigned assumes that Plaintiff's separation from HMA was an adverse employment action. In the light most favorable to Plaintiff, she believed that she either had to retire or faced termination.

Plaintiff, however, fails to establish a prima facie case because she has not shown that she was meeting HMA's legitimate expectations at the time of her separation from the company. She was placed on an improvement plan in early 2008, and although there is evidence that she met the goals on it (which she drafted and which basically listed the same tasks she performed in the past), there is no indication that the financial performance of the hospital (which Plaintiff admitted was bad) (<u>see</u> P. Dep. 65) improved (<u>see</u> Briggs Dep. 56-60, Ex. 4).[6] Although Plaintiff appears to allege that her performance was meeting expectations because Briggs testified that she was not prepared to

_____

[6]On Briggs' report, there were a number of areas in which Chester Regional was not meeting expectations including earnings, growth initiatives (hospital admissions), hospital quality care from a consumer perspective, patient satisfaction with relationship to emergency, and physician satisfaction. A number of areas were not meeting expectations, but improving, including the financial indicators of payroll, supplies, and bad debt; quality core measures; nursing score cards; patient satisfaction with outpatient service; and employee satisfaction. Briggs Dep., Ex. 5.

terminate Plaintiff at the December 4, 2008 meeting, this in no way contradicts HMA's position that Plaintiff was not meeting its legitimate expectations.

(3)    <u>Legitimate/Nondiscriminatory Reason/Pretext</u>

Even if Plaintiff can establish her prima facie case of age discrimination, HMA has articulated a legitimate, nondiscriminatory reasons for Plaintiff's separation, that Briggs decided to offer Plaintiff a retirement package because the performance of Chester Regional was not meeting expectations and needed to improve, Plaintiff expressed a desire to retire in the future, and Briggs believed that the retirement offer could achieve both objectives. <u>See</u> Briggs Dep. 34-35.

Plaintiff has not shown that the reasons given by HMA for its decision are false or pretextual. Although Plaintiff disputes that she told HMA employees that she was thinking about retiring in the next year or two, and she claims that her performance was satisfactory or better, she fails to show that the articulated reasons for terminating her - that Briggs believed that Plaintiff was interested in retiring, that the performance of Chester Regional was not meeting expectations, and that the retirement package was a win/win situation - does not show that the articulated reason for her termination was false or was not the real reason for the action. Although Plaintiff appears to dispute that it was entirely her fault that Chester Regional was not meeting its goals, she does not dispute that the hospital was not meeting its goals. <u>See</u>, <u>e.g.</u>, <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274 (4th Cir. 2000); <u>Kun v. Berkeley County Gov't</u>, 214 F. Supp.2d 559, 566 (D.S.C. 2001), <u>aff'd</u>, 32 Fed. Appx. 689, 2002 WL 570670 (4th Cir. Apr. 17, 2002)(employee cannot establish pretext by simply contesting the merits of the disciplinary actions). It is the employer's perception of job performance, and not the employee's perception that is controlling. <u>See</u> <u>Dejarnette v. Corning, Inc.</u>, 133 F.3d 293

14

(4th Cir. 1998); Smith v. Flax, 618 F.2d 1062 (4th Cir. 1980); Shore v. A. W. Hargrove Ins. Agency, Inc., 873 F. Supp. 992, 998 (E.D. Va. 1995); Simmons v. Marsh, 690 F. Supp. 1489, 1493 (E.D.Va. 1988), aff'd, 852 F.2d 566 (4th Cir.), cert. denied, 488 U.S. 996 (1988). Federal Courts "do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005), citing DeJarnette v. Corning, Inc., 133 F.3d at 299.

Plaintiff has not shown that "but for" her age, HMA would not have taken the alleged adverse action. She appears to argue that she has "but for" evidence because Briggs (who is 57 years old) replaced Plaintiff with Walker who is 41 years old, replaced the Lake Norman CEO in his 50s with someone in his 40s; she filled a vacancy at Carolina Pines with someone in his 40s; and did not replace the CEOs (who were in their 40s) at Davis, Hamlet, and Gaffney. See Briggs 48-55. This simply fails to reach the level of showing that she was involuntarily retired or terminated based on her age.

B.    Title VII

Plaintiff claims she was discriminated against based on her sex because there is a substantial difference in male and female pay at HMA. HMA argues that Plaintiff cannot establish a prima facie case of gender discrimination because she fails to establish her prima facie case and it has articulated legitimate, nondiscriminatory reasons for its action.

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may proceed

under ordinary principles of proof using direct or indirect evidence, or, in the absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973) to establish a prima facie case of discrimination. To establish a prima facie case of pay disparate treatment/wage discrimination under Title VII a plaintiff must show that: (1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job. Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir.1994); Kess v. Municipal Emps. Credit Union of Baltimore, Inc., 319 F.Supp.2d 637, 644 (D.Md.2004). McDonnell Douglas provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer provides the required evidence of a nondiscriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

        (a)    Prima Facie Case

Plaintiff appears to argue that she has established her prima facie case because of the 47 CEOs HMA employed at HMA hospitals in 2009, males were paid a median salary of $213,150 compared to $169,950 for females, even though the hospitals headed by females were slightly larger in terms of number of beds. See Plaintiff's Opp. Mem., Ex. H (Plaintiff's Calculations). She also appears to assert that she is similarly situated to Gary Lang ("Lang"), the CEO of HMA's Monroe, Georgia hospital, who was paid $206,000 in 2009 (see Plaintiff's Dep., Ex. 39 - CEO salaries). Plaintiff appears to assert that Lang is similarly situated to her because Chester

Regional has 82 beds and Monroe has 77, Chester has a population of 32,410 and Monroe has a population of 25,425, and both are located within 45 miles from a major city (Chester -Charlotte and Monroe -Atlanta).

Plaintiff fails to establish her prima facie case under Title VII because she has not shown that she was paid less than similarly-situated hospital CEOs. Her compensation was higher than six other CEOs in thirteen of HMA hospitals with a bed size of under 100. See P. Dep., Ex. 39. The highest paid individual in this category is female. Id. Of the seven employees who were paid at a higher level than Plaintiff, four are females. Id. Additionally, Plaintiff's male replacement was paid at a level less than Plaintiff. Id.; Walker Decl. Further, she has presented no evidence to show that Lang's position (including his job responsibilities) at the Monroe hospital was sufficiently similar to her position at Chester Regional.

(b)     Legitimate, Nondiscriminatory Reason/Pretext

Even if Plaintiff can establish her prima facie case of discrimination under Title VII as to Lang, HMA has articulated legitimate, nondiscriminatory reasons for paying Lang more than Plaintiff, that Lang was more qualified than Plaintiff and it had to pay him more to attract him to the position. Plaintiff has a Bachelor's Degree in Nursing and did not gain experience as a hospital administrator until 1996. P. Dep., Ex. 2. Lang has a Master's Degree in Hospital and Health Administration and has worked in the capacity of administrator or CEO since 1981. Herriage Decl. Herriage states that Lang was hired for the Monroe hospital at a salary of $200,000 because this salary was necessary to attract him to the position. She further states that at the time the offer was made, Lang's base salary with his previous employer was $185,000. Herriage Decl. Plaintiff fails to show that these reasons are false or pretext for discrimination.

C.    <u>EPA</u>

Plaintiff alleges that Defendants failed to provide her equal pay for equal work (that she was paid less than her male counterparts) in violation of the EPA.  Defendants argue that Plaintiff cannot establish discrimination in violation of the EPA because she fails to show that a similarly-situated male employee was paid more than her, and that it has shown that the alleged comparator was paid more than Plaintiff based on factors other than his gender.

To establish a prima facie case under the EPA, a plaintiff must prove: "(1) that her employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions."  <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598, 613 (4th Cir.1999)(citing <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 189 (1974)); <u>see</u> <u>Reece v. Martin Marietta Techs., Inc.</u>, 914 F.Supp. 1236, 1240 (D.Md. 1995).  If the plaintiff establishes a prima facie case under the EPA, the burden shifts to the defendant to prove that the pay differential is justified by the existence of one of the four statutory exceptions set forth in § 206(d)(1): (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex.  <u>Strag v. Board of Trustees</u>, 55 F.3d 943, 948 (4th Cir. 1995); <u>Reece.</u>, 914 F. Supp. at 1241 (D.Md. 1995).  If the employer is unable to meet the burden of proving a defense, then the employer is liable for sexual discrimination in pay.  <u>Reece</u>, 914 F.Supp. at 1241(citing <u>Strag</u>, 55 F.3d at 948).  Once this burden is met by the employer, "the plaintiff's claim must fail unless the plaintiff can satisfactorily rebut the defendant's evidence."  <u>Strag</u>, 55 F.3d at 948.

Plaintiff fails to establish her prima facie case under the EPA because she has not shown that her alleged comparator, Lang, held a job that required equal skill, effort, and responsibility to hers

and that his job was performed under similar working conditions. She appears to argue that she has met these requirements because Lang's job was at a similarly-sized hospital that is similar distance from a major city. This, however, fails to meet all of the required factors such that Plaintiff has not met her burden.[7]

Even if Plaintiff could establish her prima facie case under the EPA, Defendants have articulated reasons for paying Lang more than Plaintiff that are based on factors other than his gender. As discussed above in conjunction with Plaintiff's Title VII claim, Lang was paid more because he holds a Master's Degree in Hospital and Health Administration which Plaintiff did not have (Plaintiff has a Bachelor's Degree in Nursing), and he worked in the capacity of Administrator/CEO or higher since 1981 (as opposed to 1996 for Plaintiff). Additionally, Defendants provide that a higher salary offer was necessary to attract Lang to the position and Lang's base salary with his employer was $185,000 at the time (2007) that HMA offered him the Monroe job at $200,000. Courts have, in certain circumstances, found that market forces are legitimate, non-discriminatory factors (Title VII) or factors other than sex. See, e.g., Cullen v. Indiana Univ. Bd. of Trs., 338 F.3d 693, 703 (7th Cir. 2003)(market forces, educational credentials and other factors may be legitimate reasons to justify pay disparity); Schultz v. Department of Workforce Development, 752 F.Supp.2d 1015 (W.D.Wis. 2010)("An employer may take market forces into account when determining the salary of an employee, provided there is no evidence suggesting that the employer took advantage of any kind of market forces that would permit different pay for a male and female for the same position."); Ratts v. Business Sys. Inc., 686 F.Supp. 546, 552 (D.S.C. 1987)("There is

---

[7]Nor can she establish a prima facie case based on her median salary comparison. She fails to establish that her comparators held jobs that required equal skill, effort, and responsibility to hers and that their jobs were performed under similar working conditions.

no violation of the [EPA] if management is forced to pay more money to be able to hire someone with special skills or fill a particular need."). Plaintiff fails to rebut HMA's articulated reasons for paying Lang a higher salary.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff argues that her motion for summary judgment should be granted because Defendants' counterclaims are barred by the Older Workers Benefit Protection Act ("OWBPA") amendment to the ADEA. She also argues that counterclaim cases arise in a context where there is a release, waiver, or covenant to sue which fails to comply with the OWBPA, but here there is no evidence that she agreed to any release, waiver or covenant not to sue as a part of the alleged retirement contract.

The OWBPA provides specific requirements for waiving a claim under the ADEA. "An individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). An agreement purporting to waive an individual's rights arising under the ADEA that fails to conform to the statutory requirements does not waive an employee's right to seek relief under the ADEA. Oubre v. Entergy Operations, 522 U.S. 422, 426-428 (1998). The Supreme Court stated that "[t]he statutory command is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." Oubre, 522 U.S. at 426-427.

HMA argues that Plaintiff's motions should be denied because her claims are not barred by the OWBPA. Defendants argue that Oubre simply means that Plaintiff was not required to tender back her retirement payments to file her claims, and does not make their counterclaims invalid. HMA argues that its counterclaims are not based on the argument that Plaintiff released her claims,

but rather on the argument that she agreed to voluntarily retire in exchange for compensation, and that she breached this agreement by bringing this action claiming she did not voluntarily retire.

As it is recommended that Defendants' motion for summary judgment be granted, it is recommended that Plaintiff's motion for summary judgment be granted, as Plaintiff's claim that she has been involuntarily retired in violation of the ADEA will be extinguished if the recommendation is granted.

## CONCLUSION

Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 28) be **granted**. It is further recommended that Plaintiff's motion for summary judgment (Doc. 27) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

March 1, 2012
Columbia, South Carolina